**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

---

|  |  |  |
|---|---|---|
| ASSA ABLOY SALES AND MARKETING GROUP, INC., | : | |
| | : | |
| | : | CIVIL ACTION NO: |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THOMAS TUTTLE, | : | |
| | : | |
| Defendant. | : | JULY 3, 2024 |

---

## VERIFIED COMPLAINT

ASSA ABLOY Sales and Marketing Group, Inc. (hereafter, "AASM," the "Company" or "Plaintiff") for its Verified Complaint against the Defendant Thomas Tuttle ("Tuttle"), alleges and states as follows:

### PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff is a corporation organized under the laws of the State of Delaware, with its principal place of business in Connecticut.

2.    Tuttle is an Indiana citizen who resides in Westfield, Indiana.

3.    This action arises under the Defend Trade Secrets Act (18 U.S.C. §§ 1832 *et seq.*), Connecticut statutory and common law, and Tuttle's contractual and common law obligations to Plaintiff.

4.    This Court has jurisdiction over the subject matter of this case pursuant to at least 28 U.S.C. §§ 1331 and 1338(b).

5.    This Court has supplemental jurisdiction over the claims in this Complaint that arise under state statutory and common law pursuant to 28 U.S.C. § 1367(a) because these state law claims

1

are so related to Plaintiff's claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative facts.

6.      This Court has personal jurisdiction over Tuttle because Tuttle contractually agreed to the personal jurisdiction of the United States District Court for the District of Connecticut for the adjudication of claims asserted in this action. (*See* Exhibit A, Section IV(d); Exhibit B, Section 11).

7.      Venue is proper in the United States District Court for the District of Connecticut pursuant to 28 U.S.C. § 1391(b).

## ALLEGATIONS COMMON TO ALL COUNTS

### *The Business and Trade Secret Information of AASM*

8.      AASM is part of the Americas' division of the ASSA ABLOY Group ("ASSA ABLOY"), the global leader in access solutions and manufacturer of access solution products, including electrical and electromechanical locks, architectural door hardware, door security and electronic access control and identification products, mobile keys, steel and hollow metal doors and frames, wood doors and frames, interior aluminum doors and frames, specialty doors, auto operators, perimeter fencing and barriers, gates and guard booths. ASSA ABLOY has more than 60,000 employees world-wide with leading positions in much of Europe, North America, and Australia.  The Americas' division is headquartered in New Haven, Connecticut, with most of its sales occurring in the United States, Canada, and Mexico.  Well-known brands within the Americas division include Sargent, Ceco, Curries, and others.

9.      To better serve its customers and promote the ASSA ABLOY brands, AASM devotes significant financial resources to establishing, developing, and growing relationships with architectural partners that will use its products in their designs.  In addition, AASM devotes significant financial resources to establishing and providing such partners with the products,

2

specifications, and pricing arrangements they need to sell their designs incorporating ASSA ABLOY products and specifications to their customers.

10.     The results of these efforts are reflected, in part, in AASM's internal reporting, specifications, pricing arrangements, customer information, financial and marketing information, present and future business plans, discounts, production information, sales, and inventory, and other information not known in the general public or in the trade or industry in which AASM and ASSA ABLOY operate ("Confidential Information").

11.     The Company has invested substantial resources in developing this Confidential Information, and the information is not generally known or readily ascertainable by those outside the Company.

12.     The Company has taken reasonable measures to maintain the confidentiality of the Confidential Information by, among other things, requiring employees who work with this information to agree to maintain the confidentiality of the information and use it only in connection with the business of the Company, implementing access controls to limit the data to which employees have access based on their role and responsibilities within the organization, data encryption to prevent data theft, and a variety of other network, identity, and endpoint protections.

13.     In addition, and in a further effort to protect Confidential Information, the Company maintains a computer system that is password protected on which it stores portions of its Confidential Information.

<u>*Tuttle and His Relationship with the Company*</u>

14.     Tuttle began as an employee of the Company on December 1, 2016 as a Distributor Sales Representative.

3

15.     On November 1, 2017, Tuttle assumed the role of Sales Representative, Architectural, a role he held until his separation from employment with the Company in 2024.

16.     As a Sales Representative, Architectural, Tuttle was a promoter and the face of ASSA ABLOY in the field to work with architects to promote ASSA ABLOY solutions and products across its brands. This included working remotely and in-person with architects to secure opportunities to get ASSA ABLOY products into architect specifications, and thereby receive the order for the products AASM represents.

17.     In his role as Sales Representative, Architectural, Tuttle had access to and developed Confidential Information and trade secrets, including but not limited to, customer and supplier contacts, confidential information about customers, pricing, specifications, discounts, business plans, financial data and more.

18.     As a condition of his initial employment with the Company, Tuttle executed a Confidentiality, Non-Compete and Non-Solicitation Agreement on November 14, 2016. In so doing, and as a condition of his employment by the Company, Tuttle agreed to, *inter alia*, provisions concerning the safeguarding of Confidential Information and trade secrets belonging to the Company and its affiliates both during and after the employment relationship, as well as to restrictions on his ability to compete or become employed by competitors of ASSA ABLOY for a twelve (12) month period after the date of his separation from service to the Company.

19.     A true and correct copy of the Confidentiality, Non-Compete and Non-Solicitation Agreement executed by Tuttle on November 14, 2016, is attached hereto as Exhibit A (hereafter, the "Non-Compete Agreement"). The Non-Compete Agreement refers to Tuttle throughout as "Employee."

20.     In executing the Non-Compete Agreement, Tuttle agreed to the following provisions contained therein concerning the protection of the Company's Confidential information and trade secrets, and the return of such information to the Company following the end of his employment:

**I.      <u>Confidentiality</u>**

(a)  Employee acknowledges that, in the course of performing and fulfilling his duties, he will have access to, be entrusted with and create confidential and proprietary information (whether or not classified as a trade secret) concerning the Company and its Affiliates, and that the disclosure by him of any such information would be highly detrimental to the interests of the Company and its Affiliates.

(b)  Employee further acknowledges and agrees that such information constitutes a valuable business asset of the Company and its Affiliates, and that the right to maintain the confidentiality of such information is a proprietary right which the Company and its Affiliates are entitled to protect. Accordingly, Employee covenants and agrees with the Company that he will not at any time, during or after his employment with the Company, disclose or furnish to any person, firm or corporation any such confidential or proprietary information of the Company or its Affiliates, in whatever form, including without limitation the following:

i.   information relating to products and services, pricing, actual or potential customers, customer needs and data, suppliers, processes, know-how, specifications, technical information, designs, drawings, concepts, test data, formulas, methods, business and decision making processes, manufacturing processes, manufacturing data, cost data, capabilities, product data and product functionality and performance, engineering data, environmental data, compositions, ideas, algorithms, techniques, developmental or experimental work, research, improvements and discoveries, licenses, registered or common law trade right or other intellectual property rights, trademarks, copyrights, patents, patent applications, proprietary rights, inventions, computer networks and data stored thereon, computer programs, proprietary software, financial data and personnel data;

ii.  information relating to plans for research and development, plans for products and services, marketing and selling, sales forecasts, earnings and earnings projections, profit margins, business plans, budgets and unpublished financial results and statements, legal matters, planned acquisitions and

divestitures, planned purchases and other strategic planning information

iii. information regarding the skills and compensation of employees of the Company and its Affiliates, personnel and policy manuals, and contracts with employees, customers, suppliers, consultants, strategic partners, business partners and others; and

iv. any other confidential and/or proprietary knowledge, data or information owned, developed or possessed by the Company or its Affiliates that is not available to the public, whether in tangible or intangible form that gives the Company or its Affiliates competitive advantage over others that do not have the information.

(c) Within five (5) days of Employee leaving his employment with the Company for whatever reason, be shall return all documents and materials (in whatever form) held by him and relating in any way to his employment, including without limitation any copies, notes, files, computer software or data on computers or other devices used by Employee (regardless of ownership), or other property of the Company or any of its Affiliates.

(*See* Exhibit A, Section I) (emphasis in section headings in original).

21.     In executing the Non-Compete Agreement, Tuttle agreed to the following provisions contained therein concerning his agreeing not to compete with the Company for twelve (12) months following his separation of service with the Company:

## II.     <u>Non-Compete</u>

(a)  Employee agrees that during the period of his employment and for a period of twelve (12) months from the date the Employee separates from service with the Company for any reason, whether voluntarily or involuntarily, he shall not, directly or indirectly, without prior written consent of the Company, become employed by, aid or participate in the business efforts of, sell for, promote, compete on behalf of, provide management, executive, technical professional or other services to, or become engaged in any manner by, or otherwise assist any Competing Business, anywhere in the Restricted Territory.

(b)  For Purposes of this Agreement, "Competing Business" means any person or entity (and their parents, subsidiaries, affiliates, and

successors) that provides, or owns, invests in, operates, manages or controls any venture or enterprise that engages in the business of, architectural door hardware, door security and electronic access control and identification products, wireless and digital locking solutions, mobile keys, steel and hollow metal doors and frames, wood doors and frames, interior aluminum doors and frames, specialty doors, auto operators, perimeter fencing and barriers, gates and guard booths, and the related parts and accessories of each of them, and any other products developed, manufactured, distributed and/or sold by the Company or the ASSA ABLOY Group during the Employee's employment, anywhere in the Restricted Territory. The Employee acknowledges and agrees that his duties and responsibilities cover the Company's operations throughout the Restricted Territory, and, therefore, that the geographic scope of this covenant is reasonable and necessary to protect the Company's business interests.

(c)  For purposes of this Agreement, the "Restricted Territory" is defined as the United States. Employee acknowledges that the Company and its Affiliates have business operations and sales throughout the world. Employee agrees that his obligations under this Agreement extend throughout the world and that imposing the restrictions in this Section II throughout the United States and Canada is fair and reasonable and necessary to protect the legitimate business interests of the Company and its Affiliates. Employee further acknowledges that the foregoing restrictions, and enforcement of such restrictions by way of an injunction as set forth below, will not unfairly or unreasonably interfere with Employee's ability to earn a living or obtain other employment based on his skills, abilities, and experience.

(*See* Exhibit A, Section II) (emphasis in section headings in original).

22.     As a condition of his initial employment with the Company, Tuttle also executed an Employee's Confidentiality Information and Patent Agreement on November 14, 2016. In so doing, and as a condition of his employment by the Company, Tuttle agreed to provisions concerning the safeguarding of Confidential Information and trade secrets belonging to the Company and its affiliates both during and after the employment relationship.

23.     A true and correct copy of the Employee's Confidentiality Information and Patent Agreement executed by Tuttle on November 14, 2016, is attached hereto as Exhibit B (hereafter, the

"Confidential Information Agreement"). The Confidential Information Agreement refers to Tuttle throughout as "Employee."

24.     In executing the Confidential Information Agreement, Tuttle agreed "[n]ot to disclose to others or use (except on behalf of ASSA ABLOY), any of ASSA ABLOY's Confidential Information."

25.     Pursuant to the Confidential Information Agreement, Confidential Information includes:

> . . . information disclosed to or known by [Tuttle] during or as a result of, or through employment by ASSA ABLOY. It includes information conceived, originated, discovered or developed by [Tuttle], either solely or jointly with others, and includes trade secrets, know-how, scientific and technical matters such as ASSA ABLOY's products, processes, manufacturing data, inventions, equipment, formulae, processes, compositions, ingredients, devices, methods, product ideas, special machinery, apparatus, tools, appliances, experiments, research, inventions, designs and drawings. It includes business matters such as employee information, and lists, computer data, expertise, sales initiatives, decision-making processes, research, costs, customer lists, customer information, individual salaries and incentive plans, financial and marketing information, present or future business plans, discounts, production information, sales, inventories and properties, and such other information not known in the trade or industry, the disclosure of which may be harmful to the interest of ASSA ABLOY.

> (*See* Exhibit B, Section 1)

26.     Both the Non-Compete Agreement and the Confidential Information Agreement contain clauses wherein Tuttle agreed to submit to the personal jurisdiction and venue of this Court. (*See* Exhibit A, Section IV(d); Exhibit B, Section 11).

### <u>*Tuttle's Theft of Confidential Information*</u>

27.     On or about May 22, 2024, Tuttle unexpectedly informed his manager, Tracie Ortega, Regional Architectural Director, that he was resigning his employment with the Company effective May 22, 2024, and indicated his intent to provide two weeks' notice.

28.     Tuttle's last day of employment with the Company was May 29, 2024.

29.     Unbeknownst to the Company at that time, Tuttle had, in the days before providing his resignation, copied a massive number of Company computer files from his Company-issued laptop to an external storage device.

30.     Specifically, during the period of 10:35 p.m. ET on May 20, 2024, through 4:30 a.m. ET on May 21, 2024, Tuttle used his Company-issued laptop to copy over *eighteen thousand (18,000)* files to an external device, which included AASM's confidential and proprietary information and trade secrets.

31.     The information contained in the documents copied includes information concerning customer buying programs, customer sales information, pricing strategies, reward incentives, credit applications, sales activity and results, key performance indicator goals and objectives, specification activity reports for local and national reporting, company meeting notes, price books, and architect and security drawings.

32.     The information contained in the files copied by Tuttle could be used to compete with the Company by undercutting its pricing, undermining its marketing and sales strategies, and copying its specifications and proposals, as well as providing a competitor with insight into ASSA ABLOY's business strategies and practices which are not generally known within the industry or by the public, and its use by Tuttle on behalf of himself or a competitor would cause the Company and its affiliates significant irreparable harm.

### *Tuttle Did Not Have Permission to Steal AASM's Confidential Information*

33.     At no time did the Company authorize Tuttle to use its computer systems to copy its information to an external USB device, let alone over 18,000 files, in the lead up to his resignation, a multitude of which contain extremely sensitive and confidential information concerning the

Company's business. Indeed, Tuttle's doing so violates ASSA ABLOY corporate policies, including its Code of Conduct.

34.     Tuttle agreed to abide by ASSA ABLOY's Code of Conduct by way of executing an acknowledgment of its Code of Conduct on November 14, 2016.

35.     A true and accurate copy of ASSA ABLOY's Code of Conduct applicable to Tuttle during the relevant time period is attached hereto as Exhibit D. A true and accurate copy of Tuttle's acknowledgment of, and agreement to abide by ASSA ABLOY's Code of Conduct, executed by Tuttle on November 14, 2016, is attached hereto as Exhibit E.

36.     ASSA ABLOY's Code of Conduct applicable to Tuttle during the relevant time period provides, in relevant part:

> Any information that, if disclosed, risks placing ASSA ABLOY at a competitive disadvantage shall be treated as confidential and may only be disclosed to anyone in need of the information to perform their work. This also applies after the termination of employment . . . .

> (*See* Exhibit D, p. 11).

37.     Additionally, Tuttle agreed to maintain the confidentiality of Confidential Information, and not to use or disclose it, in both the Non-Compete Agreement and the Confidential Information Agreement.

38.     Tuttle also agreed in the Non-Compete Agreement to return all Confidential Information within five (5) business days of his separation from service with the Company and failed to do so.

39.     Tuttle never notified the Company of his copying of files to the external USB drive, and took no action to return that pilfered information to the Company subsequent to his last day of employment, in blatant violation of his obligations.

40.     Upon information and belief, Tuttle still possesses the Company's Confidential Information and trade secrets in violation of his statutory, contractual, and common law obligations to the Company.

*After Stealing Confidential Information, Tuttle Begins Working for a Competitor of the Company*

41.     Following his theft of AASM's Confidential Information and trade secrets and resignation from employment with the Company, Tuttle, upon information and belief, became employed by Baines Group, Inc., a competitor of AASM, in Indiana.

42.     Baines Group, Inc. is a Competing Business within the Restricted Territory, as defined in the Non-Compete Agreement, in that it provides, or owns, invests in, operates, manages or controls ventures or enterprises that engage in the business of, life safety & loss prevention hardware; architectural door hardware & door security accessories; decorative door hardware; thresholds, weatherstripping, hinges, and fire door gap solutions; stainless steel doors and frames; architectural hinges; locks, exits devices, and door closers; and electrified access and egress solutions; and other products competitive with those manufactured and sold by the Company and its affiliates during Tuttle's employment within the United States.

43.     Similarly to ASSA ABLOY, upon information and belief, Baines Group, Inc. provides its various competitive products to customers through affiliated brands and markets them to the same architects and architect groups as ASSA ABLOY, seeking to have these competitive products integrated into such architects' plans proposed to their customers.

44.     Tuttle's employment by Baines Group, Inc. is in direct violation of his obligations under the Non-Compete Agreement in that he not become employed by a Competing Business in the Restricted Territory, as those terms are defined within the Non-Compete Agreement.

*Tuttle's Possession of AASM's Confidential Information Is Causing Immediate, Irreparable Harm to the Company*

45.     The confidential and trade secret information stolen by Tuttle would be invaluable to Baines Group, Inc. in competing with ASSA ABLOY, in that it would allow Baines Group, Inc. to identify ASSA ABLOY architect contacts, vendors, pricing, discounts, key performance indicators, and business goals, which would permit Baines Group, Inc. to gain an unfair advantage in the marketplace for the common products promoted by both companies.

46.     Tuttle's use or disclosure of the Company's confidential and trade secret information, including Confidential Information, would damage and cause irreparable harm to ASSA ABLOY by, among other things, impairing its ability to retain existing customers/accounts, engage new customers/accounts, and maintain the confidentiality of ASSA ABLOY's confidential and proprietary pricing and business model.

47.     The Company requires injunctive relief to prevent Tuttle from further violating his obligations to the Company and to prevent Tuttle from unlawfully using or disclosing the Company's confidential and trade secret information, including Confidential Information, for the benefit of himself or Baines Group, Inc.

48.     These wrongful acts on the part of Tuttle have caused and will continue to cause irreparable harm to ASSA ABLOY.

**COUNT ONE**
**TRADE SECRET MISAPPROPRIATION IN VIOLATION OF THE**
**DEFEND TRADE SECRETS ACT (18 U.S.C. §§ 1832, 1836 *et seq.*)**

49.     Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 48 as if fully set forth in this paragraph.

50.     The Company owns and possesses confidential and trade secret information, as alleged above.

51.    The Company's confidential information, including the Confidential Information, is crucial to the success of its business.  The Company makes substantial efforts to keep its Confidential Information from its competitors and the public.  The Company has taken, at all relevant times, reasonable efforts to maintain the secrecy of its Confidential Information, including requiring  its employees, as a condition of employment, to abide by strict policy provisions concerning the use and disclosure of Confidential Information, and by requiring all persons accessing ASSA ABLOY's files and databases to have personalized authentication credentials in order to access such files and databases.

52.    The measures that the Company takes are reasonable under the circumstances to maintain the information's secrecy.

53.    The Company's  confidential information, including the Confidential Information, set forth above constitutes trade secrets under the Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1836, *et seq*., because the Company has taken reasonable measures to maintain the secrecy of such assets and those assets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  Among other things, the Company's competitors would obtain economic value from the use and the disclosure of Confidential Information, including the Confidential Information available to Tuttle in his position at the Company.

54.    Tuttle has misappropriated Confidential Information.  Moreover, Tuttle acquired and/or derived knowledge and custody of AASM's trade secrets through improper means, including copying that information without authorization to an external USB device, and failing to return such information in violation of his obligations to the Company.  As such, Tuttle has misappropriated

AASM's trade secret assets by engaging in conduct prohibited by 18 U.S.C. §§ 1832 and 1836, *e.g.,* 1839 (5)(A) and (5)(B).

55.     Through his unlawful actions, Tuttle has acquired knowledge and custody of AASM's trade secrets.  Tuttle knew or had reason to know the Confidential Information was confidential. For example, Tuttle knew that, when he had access to the Confidential Information while employed by the Company, he had a duty to maintain the secrecy of that information.  Tuttle was aware of the employment policies of the Company forbidding the unauthorized access, use, or transmission of the Confidential Information.

56.     This information is used in interstate commerce by the Company – a Delaware entity with its principal place of business in Connecticut – which utilizes this trade secret information in its business throughout the United States.

57.     Tuttle's actions have therefore been in and affected interstate commerce.

58.     Tuttle's conduct, including but not limited to his knowing and unlawful misappropriation of AASM's trade secrets as alleged above, has caused the Company irreparable harm. Unless restrained and enjoined, Tuttle will continue to engage in such acts.  The Company's remedy at law is therefore inadequate to compensate it for the past and threatened injuries and thus the Company is entitled to injunctive relief as provided for by the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(A).  The Company also is entitled to and prays for all other remedies under the Defend Trade Secrets Act, 18 U.S.C. § 1836, including damages pursuant to 18 U.S.C. § 1836(b)(3)(B).

59.     Each of the aforementioned acts was done by Tuttle willfully and maliciously, with the deliberate intent to injure AASM and with the conscious disregard of AASM's rights, thus entitling

the Company to an award of enhanced damages pursuant to 18 U.S.C. § 1836(b)(3)(C).  AASM is

further entitled pursuant to 18 U.S.C. § 1836(b)(3)(D) to an award of its reasonable attorneys' fees.

**COUNT TWO**
**TRADE SECRET MISAPPROPRIATION IN VIOLATION OF THE**
**CONNECTICUT UNIFORM TRADE SECRETS ACT (CONN. GEN. STAT. § 35-50 *et seq*)**

60.      Plaintiff realleges and incorporates by reference the allegations of paragraphs 1

through 59 as if fully set forth in this paragraph.

61.      AASM owns and possesses substantial confidential and trade secret information that

it utilizes in its business, as alleged above.  These trade secrets derive independent economic value

from not being generally known or readily ascertainable by those who could obtain economic value

from their disclosure or use. The information taken by Tuttle constitutes "trade secrets" under the

Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. § 35-51.

62.      The Company has taken reasonable efforts to maintain the secrecy of its trade secrets,

including, without limitation, maintaining the trade secrets behind a password-protected computer

system and marking many of its trade secret documents as confidential. The Company also has

policies and agreements with employees prohibiting the transmittal or disclosure of its trade secrets

outside of the Company, limitations on systems access, termination of access upon termination of

employment, among other efforts.

63.      These trade secrets include, *inter alia*, the Confidential Information identified above,

all of which provide the Company with substantial financial advantages over its competitors.

64.      Tuttle acquired and continues to possess AASM's trade secrets without the Company's

consent, in violation of CUTSA.

65.      Unless enjoined by this Court, Tuttle's misappropriation of AASM's trade secrets will

cause (and have caused) significant irreparable harm to AASM, and the Company has no adequate or

other remedy at law for such acts and threatened acts. Irreparable harm is presumed when trade secrets, such as AASM's trade secret information, have been misappropriated. As such, AASM is entitled to a temporary restraining order and preliminary and permanent injunctive relief.

66.     As a direct, proximate, and foreseeable result of Tuttle's misappropriation, AASM has been damaged in an amount to be determined at trial.

67.     Tuttle's actions were and are willful and malicious, thus justifying an award of exemplary damages and attorney's fees under CUTSA.

**COUNT THREE**
**VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT (CONN.**
**GEN. STAT. § 42-110b *et seq*)**

68.     Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 67 as if fully set forth in this paragraph.

69.     In stealing AASM's confidential information and trade secrets, and immediately absconding to work for a direct competitor, Tuttle has engaged in unfair methods of competition and unfair practices in the conduct of trade or commerce.

70.     Tuttle's actions are a violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b *et seq*.

71.     As a result of Tuttle's unfair practices, ASSA ABLOY has suffered ascertainable loss of money or property, and is therefore entitled to recover actual damages for those unfair practices.

72.     Tuttle's actions were willful and wanton, and in knowing violation of AASM's legal rights, such that an award of punitive damages, reasonable costs and attorney's fees, and equitable relief restraining Tuttle's unfair practices is appropriate.

## COUNT FOUR
## BREACH OF CONTRACT – MISAPPROPRIATION OF CONFIDENTIAL INFORMATION

73.     Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 72 as if fully set forth in this paragraph.

74.     Tuttle's conduct in stealing confidential information and trade secrets of ASSA ABLOY and failing to properly safeguard such information constitutes a violation of the Non-Compete Agreement and the Confidential Information Agreement.

75.     Tuttle's failure to return confidential information and trade secrets of AASM in his possession following his separation from service with the Company constitutes a violation of the Non-Compete Agreement.

76.     An injunction preventing Tuttle from continuing to breach the Non-Compete Agreement and Confidential Information Agreement is necessary to protect the Company's legitimate business interests, including the protection of its Confidential Information from inappropriate disclosure, misappropriation, and/or misuse, including the use of the stolen information concerning Company's pricing, specifications, and customer relationships to immediately undercut the Company in the immediate aftermath of Tuttle's departure.

77.     Tuttle being permitted to breach the terms of the Agreement will irreparably harm and cause damages to the Company, such that an injunction preventing such breach should issue.

78.     A balance of the equities in this case weighs in favor of the issuance of injunctive relief to protect the Company from irreparable harm through the enforcement of contractual promises to which Tuttle voluntarily agreed in exchange for his employment at the Company, as well as access to the Company's Confidential Information and customers.

79.     Given the above, the issuance of a temporary restraining order, as well as temporary and permanent injunctive relief to protect Plaintiff from Tuttle breaching the terms of the Non-Compete Agreement and Confidential Information Agreement is appropriate.

80.     Pursuant to the Non-Compete Agreement and Confidential Information Agreement, Tuttle's conduct in misappropriating confidential information and trade secrets of AASM entitles AASM to injunctive relief and money damages, as well as an award of attorney's fees and costs.

**COUNT FIVE**
**BREACH OF CONTRACT – NON-COMPETITION**

81.     Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 80 as if fully set forth in this paragraph.

82.     The terms of the Non-Compete Agreement are reasonable in time, geography and scope, as they would limit Tuttle's competition, solicitation and provision of competitive services to Company customers and provide the Company with the time necessary to identify and hire a replacement and preserve its customer relationships, thereby protecting the Company from unfair competition as to its customers for a period of one (1) year from the separation of Tuttle's employment. Such protections are necessary for the preservation of the Company's goodwill and relationships with its customers, as well as the continued protection of its Confidential Information and trade secrets.

83.     Tuttle being permitted to breach the terms of the Agreement will irreparably harm and cause damages to the Company, such that an injunction preventing such breach should issue.

84.     A balance of the equities in this case weighs in favor of the issuance of injunctive relief to protect the Company from irreparable harm through the enforcement of contractual promises to which Tuttle voluntarily agreed in exchange for his employment at the Company, as well as access to the Company's Confidential Information and customers.

85.     Given the above, the issuance of a temporary restraining order, as well as temporary and permanent injunctive relief to protect Plaintiff from Tuttle breaching the terms of the Non-Compete Agreement is appropriate.

86.     Pursuant to the Non-Compete Agreement, Tuttle's conduct in breach of his obligations not to compete with the Company entitles AASM to injunctive relief and money damages, as well as an award of attorney's fees and costs.

## COUNT SIX
## BREACH OF DUTY OF LOYALTY TO AASM – MISAPPROPRIATION OF AASM CONFIDENTIAL INFORMATION

87.     Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 86 as if fully set forth in this paragraph.

88.     Tuttle owed a duty of loyalty to AASM while employed by the Company, a duty to maintain in confidence the confidential information and trade secrets made known to him as an employee or developed by him as an employee of the Company, and a duty not to misappropriate, disclose or use for his own benefit confidential information of ASSA ABLOY. Tuttle affirmed these duties by, among other things, executing the Non-Compete Agreement, the Confidential Information Agreement, as well as acknowledgements of AASM and ASSA ABLOY policy, including its Code of Conduct.

89.     Tuttle breached his duties to AASM.

90.     As a result of Tuttle's conduct, AASM has suffered damages and will continue to suffer damages, entitling AASM to compensatory damages in an amount to be determined.

91.     Because AASM has suffered and continues to suffer irreparable harm as a result of Tuttle's breaches of his duties to AASM, the Company is entitled to an injunction enjoining Tuttle from any further breaches of his duties to the Company, use of any information or business

opportunities made known to him as a result of his being an employee of AASM and return of all AASM confidential information and trade secrets.

## COUNT SEVEN
## UNJUST ENRICHMENT AND RESTITUTION

92.     Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 91 as if fully set forth in this paragraph.

93.     Tuttle's unlawful conduct as detailed herein, including but not limited to, his illegal theft of confidential information and trade secrets belonging to the Company for the purpose of unlawfully competing with AASM, and trading on its investments in its customer relationships, pricing, specifications, customer discounts, and product information, unjustly enriched Tuttle at the expense of AASM.

94.     As a result of Tuttle's conduct, AASM has been damaged and Tuttle have been unjustly enriched, all to AASM's detriment.

95.     Tuttle should be required to disgorge all unjust enrichments, provide restitution to AASM, and a constructive trust should be imposed for AASM's benefit on all intellectual property rights unjustly acquired using, in whole or in part, any trade secret or intellectual property belonging to AASM.

## PRAYER FOR RELIEF

WHEREFORE, AASM respectfully prays that this Court enter judgment against Tuttle:

(1)     Compelling Tuttle to return all property wrongfully obtained, including AASM's trade secrets and other confidential information;

(2)     Permanently enjoining Tuttle from making any use or disclosure of AASM's trade secrets and other confidential information, all of which were wrongfully taken by Tuttle, or utilizing derivative information;

(3)     Temporarily enjoining Tuttle from being employed by Baines Group, Inc. for the period of twelve (12) months following Tuttle's separation from service with AASM;

(4)     Permanently enjoining Tuttle from engaging in other acts of unfair competition against AASM, including any violation of his obligations under the Non-Compete Agreement;

(5)     Using AASM's Confidential Information to compete against AASM;

(6)     Awarding past and future damages for the harm caused by Tuttle's wrongful acts, plus prejudgment and post judgment interest;

(7)     Awarding AASM an accounting for all of Tuttle's gains obtained by his wrongful conduct, and discovery sufficient to confirm the scope of those gains;

(8)     Awarding punitive damages and enhanced damages as allowed under the applicable statutes or the common law;

(9)     Awarding AASM double damages and attorneys' fees pursuant to 18 U.S.C. 1836 and other applicable statutes, for Tuttle's willful and malicious misappropriation of AASM trade secrets;

(10)    Awarding AASM attorneys' fees and costs of this action; and

(11)    Awarding AASM all other relief as may be just and proper.

Respectfully submitted,

PLAINTIFF,
ASSA ABLOY SALES AND
MARKETING GROUP, INC.


By:   */s/ Justin E. Theriault* _____
          Justin E. Theriault (ct28568)
          JACKSON LEWIS P.C.
          90 State House Square, 8th Floor
          Hartford, CT 06103
          Tel: (860) 522-0404
          Fax: (860) 331-2588
          Email: justin.theriault@jacksonlewis.com
          *Attorney for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| ASSA ABLOY SALES AND MARKETING GROUP, INC., | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO: |
| | : | |
| v. | : | |
| | : | |
| THOMAS TUTTLE, | : | |
| | : | |
| Defendant. | : | |

## **VERIFICATION**

I, Thomas Clelland, certify as follows:

1. I am the Senior Director, Architectural Development for ASSA ABLOY Sales and Marketing Group, Inc., the plaintiff in this action.

2. I have read the above and foregoing Verified Complaint.

3. The facts stated in the foregoing Verified Complaint are true and correct to the best of my knowledge and information.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Thomas Clelland

Dated: 7/3/24

## <u>CERTIFICATION OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing was filed electronically and was sent on this, the 3rd day of July 2024, to the following parties and counsel of record as follows:

<u>By UPS and electronic mail:</u>

> Thomas Tuttle
> 565 Stafford Drive
> Westfield, IN 46074
> Email: Tom.Tuttle4031@outlook.com

> */s/ Justin E. Theriault*
> Justin E. Theriault

4876-2866-9646, v. 6